U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the order of the Court.**

*Barbara J. Houser*

**Signed June 30, 2005**

**United States Bankruptcy Judge**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case Nos. 401-40783-BJH-11 |
| | § | Through 401-40790-BJH-11 |
| KEVCO, INC., et al. | § | |
| | § | Chapter 11 |
| | § | |
| | § | Jointly Administered Under |
| Debtors. | § | Case No. 401-40783-BJH-11 |
| | § | |
| PLAN ADMINISTRATION AGENT, | § | |
| ACTING ON BEHALF OF KEVCO, INC. | § | |
| UNDER ITS CONFIRMED PLAN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Adversary Proceeding |
| | § | Case No. 4-04-04239-BJH |
| COASTAL INDUSTRIES, INC., | § | |
| | § | |
| Defendant. | § | |

### MEMORANDUM OPINION

On February 5, 2001 (the "Petition Date"), Kevco, Inc., along with its direct and indirect wholly owned subsidiaries and affiliates (collectively, the "Debtors") filed their voluntary petitions

---

**Memorandum Opinion**  Page 1

for relief under Chapter 11 of the Bankruptcy Code (collectively, the "Kevco Case"). At the time, Kevco, Inc. had neither income from operations nor employees. Tr. 3/8/05, 68:7-9, 76:16-22.[1] Rather, it was a publicly-held corporation which owned 100% of the outstanding stock of Kevco Holding, Inc., which in turn owned 100% of the stock of, among other things, Kevco Components, Inc. and Kevco GP, Inc. Tr. 3/8/05, 67:22-68:6. The latter two entities served as the limited and general partners, respectively, of Kevco Distribution, L.P. ("Distribution") and Kevco Manufacturing, L.P. ("Manufacturing"). *Id.* Concurrently with the petitions, the Debtors filed a Motion for Joint Administration of all of the related bankruptcy cases, which this Court granted on February 8, 2001. Coastal Ex. 34.

Before the Court is an adversary proceeding in which the plan agent ("Agent") under the Debtors' confirmed plan of liquidation seeks to avoid and recover alleged preferential payments made to Coastal Industries, Inc. ("Coastal") between November 7, 2000 and February 4, 2001 (the "Preference Period") under 11 U.S.C. §§ 547 and 550. Trial was held on March 7 and 8, and April 4, 2005. Closing arguments were heard on April 27, 2005. The Court exercises subject matter jurisdiction over this core proceeding pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this Court pursuant to 28 U.S.C. § 1409. This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law.

## I.    FACTUAL BACKGROUND

Prior to the Petition Date, Manufacturing made wood and plastic products and Distribution distributed a variety of building products manufactured by various vendors to the recreational vehicle industry and the manufactured housing industry (collectively, the "MHI"). Agent Ex. 58C. Distribution and Manufacturing conducted substantially all of the Debtors' business operations and generated substantially all of its operating income. Tr. 3/8/05, 70:8-23. This revised corporate structure was the end result of a series of acquisitions made by Kevco in 1997. Tr. 3/8/05, 77:21-

---

[1] Record cites are, unless otherwise noted, to the date of the trial testimony followed by the page and line number of the transcript of that date's testimony.

78:9. However, nearly all of the Debtors' operations were conducted under the trade name "Kevco."[2] Tr. 3/8/05, 110: 4-15. Prior to the Petition Date, Kevco was one of the MHI's largest distributors.

Coastal is a small manufacturing business based in Jacksonville, Florida which makes bath and shower enclosures and sells them to customers in the construction industry in general, including the MHI. Tr. 3/7/05, 7:25-8:8, 8:12-23. Coastal has not previously been sued for the recovery of a preference in a bankruptcy case, does not have in-house counsel, and has limited experience with bankruptcy cases involving its customers generally. Tr. 3/7/05, 35:5-20.

Kevco and Coastal began doing business on open account in 1982. *See* Joint Pretrial Order, ¶ 25. Throughout the relationship, Coastal transacted business with Kevco for the purpose of using Kevco's distribution and sales network to market and distribute Coastal's products to the MHI. Kevco was Coastal's largest distributor, Tr. 3/7/05, 18:5-7, 46:1-3, and Coastal was one of Kevco's largest vendors in the years prior to the Petition Date. Agent Ex. 62. In fact, Coastal was Kevco's sole source of shower doors. Tr. 3/7/05, 34:7-12; Agent Ex. 37 (Tr. 1/25/05, 27:8-13).[3]

With two minor exceptions not relevant here,[4] Coastal's invoices stated that Kevco would receive a 1% discount if it paid the invoice within 10 days, and that the net was payable in 30 days. These written terms remained unchanged throughout the parties' relationship, including during the Preference Period. Tr. 3/7/05, 101:24-102:9. There was a broad spectrum of intervals between dates

---

[2] Although there is evidence of the Debtors' corporate structure as of the Petition Date, there is no evidence of the corporate structure at other times between 1982 and 1998. On this record, the Court cannot determine when Distribution was formed. The Court also cannot determine which of the other Kevco-related entities may have performed the distribution function at any given point in time prior to Distribution's formation. As discussed further below, Coastal did business with Distribution on the Petition Date, although it contends that it thought it was doing business with Kevco, Inc. Throughout this Memorandum Opinion, the Court refers to "Kevco," often in the context of discussing the business relationship with Coastal. When the Court does so, it is referring to whatever Kevco entity was performing the distribution function at the relevant time.

[3] Agent Ex. 37 is the transcript of Hegi's deposition taken on January 25, 2005. Where the Court refers to that testimony, it cites to Agent Ex. 37, followed by the date, page and line number of the relevant testimony.

[4] Only two exceptions to the historic invoice terms existed: (i) following Kevco's acquisition of Shelter Components in 1997, Kevco requested temporary payment term extensions to 60 days for its "new" branches; and (ii) prior to, and after, Kevco's acquisition of Service Supply, Coastal issued invoices using 1% ten, net 25 terms to the Service Supply branches, as it had done in the past when dealing with Service Supply as a stand alone company. Tr. 3/7/05, 11:15-25.

of shipments by Coastal (which coincided with its invoice dates) and dates of delivery of Kevco's payment checks to Coastal (which coincided with Coastal's deposit of those checks). Tr. 3/7/05, 82:2-15, 86:1-6. It is undisputed that during the parties' lengthy business relationship, Kevco paid some Coastal invoices well prior to 30 days, paid some at 30 days, and paid some well after 30 days. Tr. 3/7/05, 86:1-6, 102:3-6. The parties' "splatter charts" visually confirm this finding.[5] Coastal Ex. 17; Agent Exs. 71, 72, 76 & 79. With the exception of occasional disputes over shipments or invoices, Kevco generally paid its vendors twice a month on the 10th and 25th, Tr. 3/8/05, 78:10-14, and its normal practice was to mail checks by regular mail. Tr. 3/8/05, 109:17-22. However, Kevco sometimes "held" checks, Coastal Ex. 50B, issued checks on "off" dates, Coastal Ex. 50C, sent checks by overnight mail, Coastal Ex. 50D, issued checks manually, Coastal Ex. 50E, or issued checks more frequently than twice a month. Coastal Exs. 3, 18 & 27. The parties agree that throughout Coastal and Kevco's business relationship, it was Kevco's usual practice to group a number of Coastal invoices and pay for them with one check. Tr. 3/7/05, 88:11-15. David Cook, Coastal's chief financial officer since 2002 ("Cook"), testified without contradiction that Coastal had always deposited the checks it received from Kevco in its bank account on the same day that it received the checks. Tr. 3/7/05, 82:11-15, 89:2-20.

Over the course of the parties' business relationship, Coastal increased Kevco's credit limit on several occasions. Tr. 3/7/05, 12:15-22. From an original credit limit of $50,000, it reached a maximum credit limit of $600,000 by the mid-1990s. Tr. 3/7/05, 12:9-13:3. However, Coastal never enforced this credit limit prior to September 2000. Tr. 3/7/05, 50:1-10, 245:17-246:2, 247:15-248:6. In fact, Coastal allowed its accounts receivable balance with Kevco to exceed $1 million many times during the parties' business relationship. Coastal Ex. 4, 9; Agent Ex. 51.

William Cobb, Coastal's Chief Executive Officer ("Cobb"), and Michelle Ford, Coastal's Vice President of Operations ("Ford"), testified that on some occasions over the course of their business

---

[5] The splatter charts are x/y graphs – each has the dates of payment plotted along the horizontal axis and the days until payment plotted along the vertical axis, with each data point representing a paid invoice.

**Memorandum Opinion**                                                                 **Page 4**

relationship, and before the Preference Period, when Kevco was late on its payments, Coastal would request that Kevco become more current on outstanding invoices. Tr. 3/7/05, 14:4-18; Tr. 3/8/05, 5:7-23. They also testified, as did former Kevco National Product Director Ryan Willits ("Willits"), that Coastal would, at times, delay releasing trucks loaded with shipments of new product until Kevco verified that the payments in question had been sent or would soon be sent. Tr. 3/7/05, 14:4-10; Tr. 3/8/05, 5:14-23, 225:25-226:14. In short, Coastal held shipments of new product to Kevco when Kevco's outstanding invoices "got old." Tr. 3/7/05, 14:2-18.[6] Coastal's general policy with respect to collecting its accounts receivable from Kevco was that a Coastal receivables clerk would call Kevco if its payments were late. *Id.*; Tr. 3/8/05, 15:2-25; Coastal Ex. 19. However, one of Coastal's officers or managers might place such calls to customers like Kevco if that officer or manager had a personal relationship with the customer. Tr. 3/7/05, 15:5-14; Tr. 3/8/05, 15:5-19. But, these collection efforts were limited to situations in which invoice payments were late. Tr. 3/7/05, 14:2-18; Tr. 3/8/05, 15:2-25.

Coastal sought to contain its risk of nonpayment as the volume of its business with Kevco increased over the years. Beginning in 1992, Coastal obtained credit insurance for certain of its accounts receivable, including its Kevco accounts. *See* Joint Pretrial Order, ¶ 30. From approximately the mid-1990s through September 2000, Coastal's credit insurance policy with Euler American Credit Indemnity ("Euler ACI") had a policy limit for Kevco's accounts of $600,000.[7] Tr. 3/7/05, 13:2-11; Joint Pretrial Order, ¶ 36; Coastal Ex. 43. Cobb told a number of people at Kevco that Coastal had obtained such insurance, *see* Joint Pretrial Order, ¶ 31, and suggested that Kevco do the same with respect to its customers, Tr. 3/7/05, 16:1-8, although Kevco had established a good track record of timely payments to Coastal. Tr. 3/7/05, 17:17-22.

---

[6] The transcript erroneously uses the word "owed" instead of "old."

[7] The policy insured Coastal against losses as a result of the insolvency of its account debtors and defined the term "loss" as "the unpaid invoice price of bona fide sales of the Insured [Coastal] shipped during the Shipment Period and actually delivered" to its U.S. customers. Agent Ex. 43; Coastal Ex. 20. Annexed to the policy was a list of account debtors approved for coverage, in the gross amount listed. The total policy limit was $1,000,000, with Kevco being approved for coverage up to $600,000. *Id.*

As noted previously, Kevco engaged in a series of acquisitions in 1997 and its business with Coastal increased. In July, 1999, Wingate Partners, L.P. ("Wingate") acquired a controlling interest in Kevco,[8] Agent Exs. 16, 58D, and a new senior management team came on board at Kevco. For example, Fred Hegi ("Hegi"), Wingate's founding partner, became chairman, president, and chief executive officer of Kevco. Agent Exs. 37 (Tr. 1/25/05, 6:8, 7:7-12), 58C. Wingate had previously acquired Redman Industries, also in the MHI, and had turned it around successfully. Agent Ex. 37 (Tr. 1/25/05, 23:19-24:8). Hegi felt that Wingate could improve Kevco's cash flow and profitability, and he began to make significant changes in Kevco's operations. Agent Ex. 37 (Tr. 1/25/05, 25:18-26:2, 29:2-14). For example, Kevco consolidated distribution centers and reduced inventory. *Id.* Kevco began a process of migrating its diverse IT platforms to one uniform IT platform. *Id.*; Tr. 3/7/05, 25:10-19. Although Kevco had used a unified cash management system prior to 1999, the cash management system became more sophisticated after the new senior management team came on board. Tr. 3/8/05, 76:10-15. Kevco's payments to vendors, including Coastal, became more regular and occurred almost invariably on the 10th and the 25th of the month.[9] Tr. 3/8/05, 93:9-16; Coastal Ex. 17; Agent Exs. 71, 72, 76 & 79. Although there is no evidence with respect to Kevco's other vendors, as regards Coastal, Kevco's practices of holding checks, issuing checks on "off" dates, sending checks by overnight mail, issuing checks manually, or issuing checks more frequently than twice a month, generally stopped. Coastal Exs. 50B, 50C, 50D, 50E; Coastal Ex. 17.

It is undisputed that the MHI experienced growth and prosperity in the 1990s. But, the MHI experienced a rapid deterioration in the late 1990s, which worsened in 2000 and has continued for several years thereafter. Tr. 3/7/05, 228:1-229:7.

On September 20, 2000, Euler ACI terminated Coastal's credit insurance coverage of Kevco's

---

[8] Kevco's SEC filings indicate that the investor was an entity called "Kevco Partners Investment Trust." Agent Ex. 58D. The answer to Question 21(b) of Kevco, Inc.'s Statement of Financial Affairs ("SOFA") discloses that Fred Hegi was a 45.8% shareholder "through the Kevco Partners Investment Trust." Agent Ex. 3; Coastal Ex. 35.

[9] While Willits testified that he did not notice stricter controls after Wingate took over senior management, the Court discounts his testimony because he was a regional manager at the time stationed in North Carolina and did not move to Kevco's corporate headquarters in Fort Worth, Texas until Wingate was already in place. Tr. 3/7/05, 259:15-20.

accounts. Tr. 3/7/05, 18:17-22; Coastal Ex. 21; Agent Ex. 40; Joint Pretrial Order, ¶ 32. Euler ACI sent Coastal a facsimile entitled "Heads Up Notice-Cancellation" (the "Heads Up Notice") in which it notified Coastal that it had terminated the credit insurance on Kevco's accounts. *Id.* The Heads Up Notice identified "continued net losses" as a basis for the termination of coverage on Kevco's accounts. Coastal Ex. 21; Agent Ex. 40. The Heads Up Notice informed Coastal that Euler ACI had downgraded Kevco's credit risk grade from "7-Watch" to "8-Substandard," it noted the industry decline and the bankruptcies or facility closures by certain of Kevco's customers, and stated that Kevco had weak cash flow from operations and limited capacity to pay interest on borrowed funds. *Id.* Finally, Euler ACI stated that "[w]ith the acquisition of Shelter Components in 1998, Kevco became the largest supplier to the industry. Unfortunately, Kevco made the acquisition just as manufactured home sales began a steep decline. Equity and debt investment in Kevco in 1999 by Wingate Partners saved the company at that time, but the losses have continued."[10] *Id.*

As soon as he learned that the credit insurance on Kevco's accounts had been terminated, Cobb called Kevco's chief financial officer, Joseph Tomczak ("Tomczak"), with whom he had never spoken, Tr. 3/7/05, 19:24-20:5, and told him that Coastal had lost its credit insurance on Kevco's accounts and, as a result, Coastal was lowering Kevco's credit limit to $200,000. Tr. 3/7/05, 19:2-20:5. Cobb also told Tomczak that Coastal would give Kevco a period of time to reduce its account receivable balance to within the new $200,000 credit limit, but did not fix a specific deadline. Tr. 3/7/05, 19:15-17. According to Cobb, Tomczak did not protest. Tr. 3/7/05, 19:18-23. Cobb also called Willits, Distribution's National Products Director, to tell him that Coastal had lost its credit insurance on Kevco's accounts, and that Coastal was reducing Kevco's credit limit to $200,000.[11] According to Cobb, Coastal would not have reduced Kevco's credit limit had the credit insurance not

---

[10] Although the Heads Up Notice says that Kevco acquired Shelter Components in 1998, other evidence shows that it was acquired in December 1997. *See* Agent Ex. 58; Tr. 3/8/05, 77:7-13.

[11] There is conflicting evidence as to whether Cobb also called Wilford Simpson ("Simpson"), who was employed at Kevco in various financial positions over the years, including chief financial officer. Simpson testified that he received such a call, Tr. 3/8/05, 84:20-21, while Cobb did not recall placing it. Tr. 3/7/05, 42:20-22.

been cancelled. Tr. 3/7/05, 20:6-9, 50:19-24. At the end of October 2000, Coastal's outstanding accounts receivable from Kevco were $931,000, which was a slight increase over the September 30, 2000, balance of $891,000. Coastal Ex. 4; Agent Exs. 51, 74. By the end of November 2000, Coastal's outstanding accounts receivable from Kevco were $429,000. *Id.* By the end of December 2000, Coastal's outstanding accounts receivable from Kevco were $151,000. *Id.*

Once its credit insurance on Kevco's accounts was cancelled, Coastal was clearly concerned about Kevco's future and the likelihood of Coastal being paid. In fact, at some point in the late fall or winter of 2000, Cobb traveled to Fort Worth to meet with Hegi to discuss "the financial capability of [Kevco] as well as the industry." Agent Ex. 37 (Tr. 1/25/05, 29:16-30:7). However, in December 2000, Coastal obtained replacement credit insurance from CNA, who was willing to insure Kevco's accounts receivable up to $200,000. Coastal Ex. 28; Agent Ex. 90; Joint Pretrial Order, ¶ 37. Thereafter, Coastal's outstanding receivables from Kevco increased from $151,000 at the end of December to $214,000 (slightly in excess of the $200,000 credit insurance and the $200,000 credit limit) on the Petition Date. Coastal Ex. 4; Agent Exs. 51, 74.

Kevco was timely paying its Coastal invoices during the Preference Period. Tr. 3/7/05, 72:10-20. Therefore, Coastal did not threaten any legal action against Kevco as to its outstanding accounts receivable; Coastal did not ask Kevco to post any security; Coastal did not require Kevco to change its method of payment from checks to some other form; Coastal did not change its written invoice terms from 1% ten, net 30; and Coastal did not ask for payment on delivery or in advance of shipments. Tr. 3/7/05, 27:1-28:25.

Coastal did, however, enforce its credit limit – for the first time in the parties' relationship – during the Preference Period. Tr. 3/7/05, 50:1-10, 245:17-246:2, 247:15-248:6. Coastal also withheld shipments of new product to Kevco, Tr. 3/7/05, 26:19-25, 51:9-25, 54:5-9, while demanding payment on still current invoices, even though Coastal had only withheld shipments in the past when its invoices to Kevco were past due. Tr. 3/7/05, 14:2-18. Coastal also demanded that Kevco send payments in excess of the value of the new product being sold to Kevco, in order to begin

reducing the receivables balance to within the new credit limit. Tr. 3/7/05, 55:1-16. According to Simpson, a Kevco financial employee, the relationship between Kevco and Coastal was "very tight and was uncomfortable" during the Preference Period. Tr. 3/8/05, 112:2-8. Kevco's payments to Coastal became more frequent and irregular. Coastal Ex. 17; Agent Exs. 71, 72, 76 & 79. Kevco issued checks to Coastal on dates other than the 10th and 25th of the month, Coastal Ex. 24, and sent some checks by overnight mail instead of first class mail, Tr. 3/8/05, 196:4-199:10, as was its usual practice. Kevco prepared manual checks, Tr. 3/8/05, 88:16-90:7, 145:11-13; Agent Ex. 66, a post-dated check, Tr. 3/8/05, 195:4-8, and sent Coastal 12 checks during a 70-day period, Coastal Ex. 24; Agent Ex. 66, which was about double the amount it had sent to Coastal in like periods over the 15 months prior to the Preference Period. Coastal Exs. 18, 27.

It is undisputed that during the Preference Period, Kevco did not have sufficient cash to pay all of its vendors on a current basis. Tr. 3/8/05, 86:8-87:18. As a result, Kevco's senior management made decisions about which vendors to pay, and it made those decisions based upon, among other things, "the need for product, how important the vendor was to the company and who was complaining the most." Tr. 3/8/05, 87:9-18. As a result of Coastal's collection activities, Coastal was paid more quickly than Kevco's other vendors, Agent Ex. 80, and Coastal was one of the first vendors paid at a time when Kevco did not have sufficient funds available to pay all of its vendors what was owed to them. Tr. 3/8/05, 86:24-87:18.

### A. The Bankruptcy Filing

As noted earlier, Kevco and its subsidiaries and affiliates filed for relief under Chapter 11 on February 5, 2001. Agent Ex. 2. Accordingly, the Preference Period ran from November 7, 2000 through February 4, 2001. On March 26, 2001, the Debtors filed their Schedules ("Schedules") and Statements of Financial Affairs ("SOFAs"). Agent Exs. 3-10. Kevco, Inc. did not list any debt owed to Coastal in its Schedules, and did not list any payments to Coastal within the 90 days preceding the Petition Date on its SOFA. Agent Ex. 3; Coastal Ex. 35. However, Kevco, Inc. listed Distribution as an affiliated company in response to SOFA Question 18, and it described the nature of

Distribution's business as "wholesale distributor of building products." Agent Ex. 3. None of the other entities listed as affiliates are described as having any distribution function. *Id.* In addition, Kevco, Inc.'s SOFA identified Distribution as a co-debtor and disclosed its bankruptcy case number. *Id.*

Distribution's Schedules listed Coastal as a general unsecured creditor on Schedule F. Agent Ex. 10. Distribution's SOFA disclosed that in the 90 days preceding the Petition Date, it had paid Coastal $1,926,172.90 – the precise amount the Agent now seeks to recover. Agent Ex. 10.

The Debtors' cases were substantively consolidated on motion of the Debtors and after notice and a hearing by Order entered on September 19, 2002. Agent Exs. 14, 15. The next day, the Debtors and the Official Committee of Unsecured Creditors (the "Committee") filed their First Amended Joint Disclosure Statement Under 11 U.S.C. § 1125 In Support of Kevco, Inc. and The Official Creditor Committee's First Amended Joint Plan of Liquidation (the "Disclosure Statement"). Coastal Ex. 31; Agent Ex. 16. The Disclosure Statement stated, among other things:

> During the 90-day period immediately preceding the Petition Date, the Debtors made various payments and other transfers while insolvent to creditors on account of antecedent debts . . . . While most of those payments were made in the ordinary course of the Debtors' business, some of those payments may be subject to avoidance and recovery by the Debtors' bankruptcy estate as preferential . . . pursuant to Bankruptcy Code Section . . . 547 . . . Inasmuch as the Debtors' investigation of such payments is in the nascent phase, it is unable to provide any meaningful estimate of the total amount that could be recovered. The Debtors' Statement of Financial Affairs on file with the Bankruptcy Court identify the creditors and insiders who received transfers from the Debtors during the applicable periods as well as the corresponding amounts of those transfers. Each of those transfers may constitute an avoidable preference and/or fraudulent conveyance.

*Id.* at p. 18.

The First Amended Joint Plan of Liquidation (the "Plan") incorporated the terms of the Disclosure Statement and stated that the Plan would be administered by the Agent, identified as Dennis Faulkner (the plaintiff in this adversary proceeding). Coastal Ex. 32; Agent Ex. 17. In broad brush, the Plan provided a mechanism to distribute the proceeds from the Debtors' pre-confirmation sales of substantially all of the Debtors' assets. *Id.* The Plan further provided for the Agent's liquidation of the assets remaining in the estate, including avoidance actions, and that any proceeds

realized from the avoidance actions would become estate property and would be distributed to creditors in accordance with the Plan. *Id.* The Plan did not identify any specific creditors or amounts of preference claims which might be pursued before or after confirmation. On November 24, 2002, this Court entered its order confirming the Plan and concurrently made findings of fact and conclusions of law in support of confirmation. Coastal Ex. 38; Agent Ex. 18.

### B. The Present Adversary Proceeding

On June 25, 2004, the Agent timely filed the complaint in this adversary proceeding seeking to avoid and recover the alleged preference payments made to Coastal. *See* Joint Pretrial Order, ¶ 10. The parties have stipulated that Kevco delivered twelve payment checks (the "Payments") to Coastal in the Preference Period as shown in the following table:

| CHECK DATE | CHECK NUMBER | CHECK AMOUNT | RECEIPT DATE | CLEAR DATE |
|---|---|---|---|---|
| 11/10/2000 | 2224970 | 456,430.46 | 11/15/2000 | 11/16/2000 |
| 11/16/2000 | 2226104 | 273,953.30 | 11/17/2000 | 11/20/2000 |
| 11/25/2000 | 2226222 | 271,377.53 | 11/24/2000 | 11/27/2000 |
| 12/1/2000 | 2226805 | 103,712.93 | 12/4/2000 | 12/5/2000 |
| 12/8/2000 | 2227675 | 123,504.31 | 12/11/2000 | 12/12/2000 |
| 12/10/2000 | 2227254 | 18,762.25 | 12/11/2000 | 12/12/2000 |
| 12/15/2000 | 2227691 | 2,814.76 | 12/20/2000 | 12/22/2000 |
| 12/15/2000 | 2227744 | 50,311.46 | 12/18/2000 | 12/19/2000 |
| 12/27/2000 | 2227968 | 344,737.59 | 1/2/2001 | 1/3/2001 |
| 1/10/2001 | 2228977 | 11,294.70 | 1/15/2001 | 1/17/2001 |
| 1/16/2001 | 2229424 | 149,088.55 | 1/17/2001 | 1/18/2001 |
| 1/19/2001 | 2229803 | 120,185.06 | 1/22/2001 | 1/23/2001 |

*See* Joint Pretrial Order, ¶ 10.

Coastal has admitted that (i) each of the Payments involved a transfer of an interest of the Debtors in property; (ii) the Payments were made to or for the benefit of Coastal; (iii) Coastal is the initial transferee of the Payments; (iv) at the time of the Payments, Coastal was a creditor of Kevco; (v) the Payments were made for, or on account of, antecedent debts owed by Kevco to Coastal before the Payments were made; (vi) Kevco was insolvent at the time of the Payments; (vii) the Payments were made on or within 90 days of the Petition Date; and (viii) the Payments enabled Coastal to receive more than it would have received if Kevco had been liquidated under Chapter 7 and the Payments had not been made. Joint Pretrial Order, ¶¶15-22. In short, Coastal admitted that the

Payments were preferences.

However, Coastal asserts several defenses to the Agent's recovery of the Payments: (i) that the Agent is barred by the doctrine of judicial estoppel from pursuing his claims; (ii) that the Payments were made in the ordinary course of business of the parties and are excepted from avoidance by 11 U.S.C. § 547 (c)(2); and (iii) a partial defense pursuant to 11 U.S.C. § 547(c)(4), commonly referred to as the subsequent new value defense. Coastal bears the burden to prove its defenses by a preponderance of the evidence. 11 U.S.C. § 547(g).

## II.    LEGAL ANALYSIS

### A.    The Judicial Estoppel Defense

Coastal argues that the Agent's claim is barred by the doctrine of judicial estoppel. The Fifth Circuit has recognized the common law doctrine of judicial estoppel in, among other cases, *In re Coastal Plains, Inc.*, 179 F.3d 197 (5th Cir. 1999) and *Superior Crewboats, Inc. v. P&I Underwriters (In re Superior Crewboats Inc.)*, 374 F.3d 330 (5th Cir. 2004). Judicial estoppel, an equitable doctrine, serves to estop "a party who has assumed one position in his pleadings . . . from assuming an inconsistent position" in later proceedings. *Coastal Plains*, 179 F.3d at 205. Its purpose is to protect the integrity of the judicial process by preventing parties from playing "fast and loose" with the courts. *Id.* In order to prevail on its defense of judicial estoppel, Coastal bears the burden of proof and must establish by a preponderance of the evidence that: (1) the Agent is taking a position clearly inconsistent with a position taken in a previous proceeding; (2) the Court accepted the previous position; and (3) the nondisclosure was not inadvertent. *Superior Crewboats*, 374 F.3d at 335; *West v. Family Express Corp. (In re Bilstat)*, 314 B.R. 608, 609 (Bankr. S.D. Tex. 2004).

Coastal argues that the first element is satisfied here because the Agent's position is inconsistent with Kevco's Schedules, SOFA, and Disclosure Statement. Coastal argues that from 1982 forward, Coastal was repeatedly led, both orally and in writing, to believe that it was doing business only with Kevco, Inc. and no other business entity, Tr. 3/7/05, 37:19-38:2, and that Kevco, Inc. did not disclose any payments to Coastal within 90 days of the Petition Date on its Schedules or

SOFA. Coastal Ex. 35; Agent Ex. 3. Coastal asserts that it does not have in-house counsel and is unsophisticated in bankruptcy matters. With regard to the second element of its judicial estoppel defense, Coastal argues that this Court accepted Kevco's position by confirming the Plan, after Kevco solicited votes for the Plan based upon the information contained in the Disclosure Statement. Finally, Coastal asserts that Kevco's failure to disclose the potential preference claim against Coastal could not have been inadvertent, because Kevco and Lain, Faulkner[12] knew of the payments made to Coastal and of the existence of a potential preference claim, yet failed to disclose it. Coastal argues that Kevco had a motive to conceal its claim. *See Coastal Plains*, 179 F.3d at 211-12. As evidence of such concealment, Coastal points to a motion filed by the Committee on July 22, 2002, which sought authority to prosecute chapter 5 claims, which did not specifically identify any particular creditors or claims to be pursued, and which was not served on Coastal.[13] Coastal Exs. 36, 37. Coastal also points to a similar motion by the Agent in 2003, which did not specifically identify prospective defendants or quantify the amount of prospective claims. Coastal Ex. 39. Finally, Coastal argues that had Kevco, Inc. properly listed its potential claim against Coastal in its Schedules and SOFA, Coastal would have been more likely to participate in the confirmation process and oppose confirmation, which "may have at least slowed the confirmation . . . ." *See Def.'s Amended Proposed Findings of Fact and Conclusions of Law*, ¶ 68. Coastal cites the *Bilstat* case for the proposition that the Agent's preference claim against Coastal is therefore barred.

The Court disagrees. First, this Court has previously found that Distribution's Schedules and SOFA disclosed, with precision, the Payments to Coastal within the Preference Period. Agent Ex. 10. In the Disclosure Statement, creditors were directed to the *"Debtors' Statements of Financial Affairs"* (plural emphasis added) for a list of creditors who may have received avoidable preferences.

___

[12] Lain, Faulkner assisted in preparing the Debtors' Schedules and SOFAs, and was later retained as the Debtors' accountants. The Agent is a principal of Lain, Faulkner.

[13] Of course, Coastal failed to file a notice of appearance in the Kevco Case which would have entitled it to receive a copy of all pleadings filed in the Debtors' cases under the local practice in this District. Creditors are only required to be served with certain pleadings in a bankruptcy case, unless they ask for broader notice. *See, e.g.*, Fed. R. Bankr. P. 2002 (listing the matters as to which service upon all creditors is required).

Agent Ex 16; Coastal Ex. 31. Further, the Disclosure Statement told creditors that prior to the Petition Date, "the Debtors were a wholesale distributor of building products . . . which was conducted primarily through Kevco's indirect, wholly-owned subsidiary, Kevco Distribution." *Id*. The test, even as formulated by Coastal, is whether the Agent's preference claim is inconsistent with the position taken in the Schedules, SOFAs, and Disclosure Statement. The Court concludes that it is not, since the potentially preferential payments to Coastal were identified on Distribution's SOFA, and the Disclosure Statement directed creditors to that SOFA for a complete list of such payments. It is undisputed that Distribution accurately identified Coastal as a creditor and the recipient of the Payments. In fact, Coastal was a creditor of Distribution, not Kevco, Inc., on the Petition Date.

Coastal's claim that if the Payments to it had been disclosed in Kevco, Inc.'s Schedules and SOFA (the entity Coastal apparently thought it was doing business with) it might have participated in the confirmation process rings hollow in light of Coastal's admission that it did not even look at Kevco, Inc.'s Schedules and SOFA.[14] Further, the test is *not* whether Coastal was misled into looking at the schedules of the wrong debtor. But, even if that were the test, and Coastal was misled into looking at the schedules of the wrong debtor, the allegedly misleading conduct – *i.e.*, leading Coastal to believe it was doing business with Kevco, Inc. – occurred prior to the Petition Date. In short, the Debtors have done nothing in connection with their bankruptcy cases which is inconsistent with the Agent's position here. Therefore, judicial estoppel is simply inapplicable.

But, even if Coastal had looked at Kevco, Inc.'s Schedules and SOFA, those documents should have led it to look further. The response to Question 18 of Kevco, Inc.'s SOFA lists all of the Kevco-affiliated entities, including Distribution. Agent Ex. 3; Coastal Ex. 35. As noted previously, even a cursory review of Kevco, Inc.'s Schedules and SOFA demonstrates that it was not an operating company. Since Coastal knew it dealt with an operating company, Kevco, Inc.'s disclosure of all of its affiliates should have led Coastal there. Specifically, the nature of

---

[14] Coastal admitted at a prior hearing in connection with the parties' cross motions for summary judgment that it did not review Kevco, Inc.'s Schedules or SOFA. Agent Ex. 28 (Transcript of this Court's oral ruling on December 13, 2004).

Distribution's business is described as "wholesale distributor of building products." *Id*. None of the other entities are described as having any distribution function. Moreover, the response to Question 19(b) of the SOFA identifies Distribution as a co-debtor and states Distribution's case number. *Id.* Finally, Kevco, Inc.'s SOFA did not list any payments to creditors. *Id*. Coastal knew it had received the Payments during the 90 days before the bankruptcy filings. The combination of these facts should have caused Coastal to look beyond Kevco, Inc.'s Schedules and SOFA. And, the Disclosure Statement, upon which Kevco solicited votes, and which Coastal received, clearly informed creditors that Kevco's distribution function was conducted through Distribution. Agent Ex. 16, p. 17.

In sum, Kevco, Inc. and Distribution completely and accurately disclosed their creditors and payments to creditors within 90 days of the Petition Date. Kevco cannot be expected to list creditors and payments based upon the creditors' perceptions. In fact, the integrity of the judicial and bankruptcy process would be more at risk if affiliated debtors were required (or allowed) to commingle creditors on their individual Schedules and SOFAs. Such commingling would be legally improper and confusing. From the Court's perspective, this is a textbook case illustrating how schedules and statements of financial affairs should be prepared. The Debtors' schedules and statements are voluminous, but appear to be accurate and complete. Under these circumstances, the Court cannot conclude that the Agent is judicially estopped from pursuing his preference claim against Coastal.

Further, the *Bilstat* case, upon which Coastal heavily relies, is distinguishable. In *Bilstat*, the debtor's statement of financial affairs failed to identify *any* payments made to any entity within the 90 days prior to the petition date. Then, the debtor scheduled a pre-petition claim held by the creditor as undisputed, non-contingent, and liquidated, and it scheduled as an asset its claim against that creditor, and stated that the debtor had a right to set off its claim (and, implicitly, no other claim) against the undisputed claim of the creditor. The creditor moved for relief from the automatic stay to set off the claims, and the debtor agreed to that relief, again acknowledging the validity of the creditor's claim and failing to assert any other debtor claim. Finally, the debtor's confirmed plan

provided the creditor with an allowed claim against the estate. Thereafter, the debtor attempted to sue the creditor to recover a preference and was found to be judicially estopped.

None of those critical facts are present here. In this case, Distribution correctly identified Coastal as a recipient of payments totaling $1,926,172.90 in the 90 days prior to the Petition Date. Kevco did not engage in any litigation or contested matters specific to Coastal or its claim prior to confirmation of the Plan. Kevco did not afford Coastal an allowed claim in the Plan. And, Kevco disclosed the potential for preference actions against those persons receiving payments during the 90 days prior to the Petition Date in the Disclosure Statement, and directed creditors to review the Schedules and SOFAs filed by "the Debtors." Agent Ex. 16; Coastal Ex. 31. Finally, the Disclosure Statement specifically informed creditors that any transfers identified within the SOFAs could be subject to avoidance. *Id*.

While it is undisputed that the checks sent to Coastal did not identify Distribution as the payor (rather, the name "Kevco" or "Kevco, Inc." appeared on documents sent to Coastal, *see, e.g.*, Coastal Ex. 41),[15] the evidence also demonstrates that Coastal had some familiarity with the fact that the distribution function at Kevco was performed by a distinct entity. For example, Coastal's phone log indicates that on February 3, 1999, someone at Coastal noted a conversation with "Rusty Harding Pres of Distribution." Coastal Ex. 19. Although Cobb testified that he had never heard of an entity called Kevco Distribution, L.P., Tr. 3/7/05, 37:7-10, he also testified that he "knew [Hardin] was made president of distribution in the last – in the last month or so before they went bankrupt . . . ." Tr. 3/7/05, 60:16-20. Cobb further testified that he had a lot of conversations with Kevco's people during the parties' business relationship, and when asked to identify the Kevco personnel with whom he conversed, he identified employees of Distribution. Tr. 3/7/05, 58:13-59:16. Finally, Coastal's claim that it believed it was dealing with Kevco, Inc., even if relevant, is belied by the fact that its

---

[15] Coastal also relies upon a "Supplier Certification" given to Coastal by Kevco, Inc., which does not make any reference to Distribution. Coastal Ex. 50H. That certificate is undated. Kevco reorganized its corporate structure in 1998, and there is no evidence that the certificate was signed or given to Coastal after the restructuring.

agent[16] filed a proof of claim on Coastal's behalf using the case number of the *Manufacturing* case (which Coastal now claims was in error).  Coastal Ex. 29.

For all of these reasons, the Court concludes that Coastal has not established that Kevco or the Agent has taken a position inconsistent with any prior statement made or position taken in this Court.[17]  Accordingly, it is impossible for Coastal to demonstrate either the second element of its judicial estoppel defense (that the Court accepted the prior inconsistent statement) or the third element of its defense (that the prior inconsistent statement was not inadvertent).  As a result, the Agent is not judicially estopped from pursuing his preference claims.

### B.     The Ordinary Course of Business Defense

As this Court noted in *SPW Corp. v. A.P.V. Equip., Inc. (In re SPW Corp.)*, "[t]he purpose of the ordinary course of business exception is to 'leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.'" 96 B.R. 676, 679 (Bankr. N.D. Tex. 1989) (quoting H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 373 (1978), *reprinted in* 5 U.S.C.C.A.N. 6329 (1978)).  Or, as stated by the Fifth Circuit in *Gulf City Seafoods, Inc. v. Ludwig Shrimp Co. (In re Gulf City Seafoods, Inc.)*, the purpose of section 547(c)(2) is to distinguish between ordinary payments and those which "represent collusive arrangements designed to favor the particular creditor during the debtor's slide into bankruptcy." 296 F.3d 363, 367 (5th Cir. 2002).  In addition, section 547 "discourage[s creditors] from racing to the courthouse to dismember the debtor during his slide into bankruptcy . . . enabl[ing] him to work his way out of a difficult financial situation through cooperation." *In re Fuel Oil Supply & Terminaling, Inc.*, 837 F.2d 224, 227 (5th Cir. 1988).  The preference provisions are also designed to facilitate the bankruptcy policy

---

[16]Coastal received payment of $200,000 from CNA under its credit insurance policy.  As a result, Continental Insurance Company, a subsidiary of CNA which provides its property insurance, filed a proof of claim on Coastal's behalf on account of Coastal's unpaid invoices.  Coastal Ex. 29.

[17] The Court previously ruled that the Agent is not barred from pursuing this claim by the doctrine of res judicata for many of the same reasons, and hereby incorporates its prior ruling to the extent relevant here.  Agent Ex. 28.

of equality of distribution among creditors.  *Id.*

In order to prevail on its ordinary course of business defense, Coastal bears the burden of proof, *see* 11 U.S.C. § 547(g), and must establish that the Payments were:

1.  in payment of a debt incurred by Kevco in the ordinary course of business or financial affairs of Kevco and Coastal (11 U.S.C. § 547(c)(2)(A));

2.  made in the ordinary course of business or financial affairs of Kevco and Coastal (11 U.S.C. § 547(c)(2)(B)); and

3.  made according to ordinary business terms (11 U.S.C. § 547(c)(2)(C)).

The parties have stipulated that the first of these three elements has been met.  Accordingly, the issues before the Court are whether Coastal has established the latter two elements by a preponderance of the evidence.

### 1.  Ordinary Course of Business Between Kevco and Coastal – the Subjective Test

Section 547(c)(2)(B) requires a determination that the Payments were made "in the ordinary course of business or financial affairs of the debtor and the transferee."  In *SPW Corp.*, this Court stated:

> In considering which transactions are 'ordinary,' courts generally look at several factors including the timing, the amount and manner a transaction was paid and the circumstances under which the transfer was made.
>
> ***
>
> As one court noted 'the cornerstone of this element [ordinary course of business] of a preference defense is that the creditor needs demonstrate [sic] some consistency with other business transactions between the debtor and the creditor.' [quoting *In re Magic Circle Energy Corp.*, 64 B.R. 269, 273 (Bankr. W.D. Okla. 1986)].

*SPW Corp.*, 96 B.R. 676 at 681.

Under section 547(c)(2)(B), the issue, in part, is whether the contested transfer occurred as part of "recurring, customary credit transactions."  *In re Air South Airlines, Inc.*, 247 B.R. 153, 158 (Bankr. D.S.C. 2000) (quoting *Energy Coop v. SOCAP Int'l, Ltd. (In re Energy Coop, Inc.)*, 832 F.2d 997, 1004 (7th Cir. 1987)).  In analyzing section 547(c)(2)(B), courts typically consider the following factors when comparing pre-preference period transfers with preference period transfers: (i) the length of time the parties were engaged in the transaction in issue; (ii) whether the amount or

form of tender differed from past practices; (iii) whether the debtor or creditor engaged in any unusual collection or payment activity; and (iv) the circumstances under which the payment was made. *See Payne v. Clarendon Nat'l Ins. Co. (In re Sunset Sales, Inc.)*, 220 B.R. 1005, 1020-21 (10th Cir. BAP 1998). Similar criteria are stated in *Air South Airlines*: (i) the prior course of dealing between the parties; (ii) the amount of the payments; (iii) the timing of the payments; and (iv) the circumstances surrounding the payments. 247 B.R. at 160. Within a limited range, the timing of a contested payment may vary from the timing of previous payments without defeating the application of section 547(c)(2)(B). *Id.* at 161 (citing *Huffman v. New Jersey Steel Corp. (In re Valley Steel Corp.)*, 182 B.R. 728, 737 (Bankr. W.D. Va. 1995)); *see ML Assocs., Inc. v. T&R Demolition, Inc. (In re ML Assocs., Inc.)*, 301 B.R. 195, 204 (Bankr. N.D. Tex. 2003) (stating that courts concentrate on the time within which the debtor ordinarily paid the creditor, whether the timing of the payments during the preference period demonstrated some consistency with that practice, comparing the prior dealings between the debtor and creditor with their dealings during the preference period to determine whether the challenged dealings are ordinary, the timing of the payments, the amount and manner in which the transaction was paid, and the circumstances under which the transfer was made). Some courts have stated that if any one factor is "compellingly inconsistent" with prior transactions, the transfer should be considered outside of the ordinary course of business. *In re Laclede Steel Co.*, 271 B.R. 127, 131 (8th Cir. BAP 2002), *aff'd*, No. 02-1389, 2002 WL 31102584 (8th Cir. Sept. 23, 2002) (unpublished disposition); *In re Sibilrud*, 308 B.R. 388, 395 (Bankr. D. Minn. 2002); *In re Stewart*, 274 B.R. 503, 513 (Bankr. W.D. Ark.), *aff'd*, 282 B.R. 871 (8th Cir. BAP 2002). The analysis under section 547(c)(2)(B) is "peculiarly factual." *In re Gateway Pac. Corp.*, 214 B.R. 870, 874 (8th Cir. BAP 1997).

Section 547(c)(2)(B) requires the identification of a baseline of payment history between the debtor and the defendant that spans a length of time and includes a significant number of transactions. *Manty v. Miller & Holmes, Inc. (In re Nation-Wide Exch. Servs., Inc.)*, 291 B.R. 131 (Bankr. D. Minn. 2003). A baseline of dealings must be established so that the court may compare payments

during the preference period with the prior course of dealing between the parties. As one court noted:

> Ordinarily, such baseline should take into account the entire course of dealing between the parties. The entire length of the relationship, *or at least a material segment of it*, should be examined to determine the baseline course of dealings. It also is important that the baseline period extend back into the time before the debtor became financially distressed . . . when the debtor's dealings were 'ordinary' in the layman's sense of the word.

*In re Pluma, Inc.*, No. 00-2070, 2001 WL 1699690, at *4 (Bankr. M.D.N.C. Apr. 11, 2001) (internal citations omitted) (emphasis added). *See In re Furrs Supermarkets, Inc.*, 296 B.R. 33, 41 (Bankr. D.N.M. 2003) (stating that the comparison should be with a period preferably well before the preference period, presumably before the debtor started experiencing financial problems, quoting *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1032 (7th Cir. 1993)); *Brown v. Shell Canada Ltd. (In re Tennessee Chem. Co.)*, 112 F.3d 234, 237 (6th Cir. 1997) (stating that generally, the entire course of dealing is considered).

### a. Defining the Relevant Historical Period Here

Kevco and Coastal had a long business relationship, dating back to 1982, all of which comprises the technical "historical period" to be compared with the Preference Period. Nevertheless, mindful of the "peculiarly factual" nature of the Court's inquiry, the Court believes that on the unique facts of this case, the relevant historical period is much more limited.

The evidence established that in the summer of 1999, new senior management took over at Kevco. After Wingate's investment in Kevco, Hegi became chairman, president, and chief executive officer, and made significant changes in how the business operated. As is relevant here, Kevco's cash management system became more sophisticated after new senior management became involved. Tr. 3/8/05, 76:10-15. Kevco's payments to vendors, including Coastal, became more regular. Tr. 3/8/05, 93:9-16. The documentary evidence corroborates Simpson's testimony that the pattern of payments from Kevco to Coastal was different after Wingate's investment and assumption of management control than it had been in prior years. Payments to vendors were unquestionably more regular and occurred almost invariably on the 10th and the 25th of the month. Agent Exs. 71, 72, 76 & 79; Coastal

Ex. 17. Further, some of the "irregularities" in payments (discussed further below), which had occurred in prior years, halted when Wingate took over Kevco's senior management. Although there is no evidence with respect to Kevco's other vendors, Kevco's practices of holding checks payable to Coastal, issuing checks on "off" dates, sending checks by overnight mail, issuing checks manually, or issuing checks more frequently than twice a month, generally stopped. Coastal Exs. 50B, 50C, 50D, 50E & 17. Therefore, the Court concludes that in order to make the appropriate comparison, the Court must compare the payments made during the Preference Period, while Wingate management was in control of the Debtors, to payments made during the 15 months immediately preceding the Preference Period, while Wingate management was also in control of the Debtors (the "Wingate Historical Period"). What happened prior to Wingate's investment in Kevco and assumption of management control is not relevant given the changes Wingate's management team put in place after its arrival.

There is some precedent in the existing case law for looking at less than the entire length of the parties' relationship. *See, e.g.*, *In re Global Tissue, L.L.C.*, 106 Fed. Appx. 99 (3d Cir. 2004) (unpublished disposition);[18] *see also In re Pluma, Inc.*, No. 00-2070, 2001 WL 1699690, at *4 (Bankr. M.D.N.C. Apr. 11, 2001) ("*Ordinarily*, such baseline should take into account the entire course of dealing between the parties.") (emphasis added); *In re Furrs Supermarkets, Inc.*, 296 B.R. 33 (Bankr. D.N.M. 2003) ("*Generally*, the entire course of dealing is considered.") (emphasis added). There are also sound policy reasons to do so here. One of the overarching goals of our bankruptcy laws is to insure that similarly situated creditors are treated equally – the so-called equality of distribution principal. *Union Bank v. Wolas*, 502 U.S. 151 (1991); *In re Criswell*, 102 F.3d 1411 (5th Cir. 1997). Section 547 of the Bankruptcy Code is one of the primary tools available to insure that

---

[18] The Third Circuit noted that "the Trustee's reliance on average payment time, as is often the case with statistics, does not portray the complete picture of [the debtor's] payment history. During the first two months . . . of [the] relationship . . . all of [the debtor's] payments were extremely late . . . [and] those late payments, concentrated primarily in the beginning of the relationship, skewed the average payment time upwards. After two months of significant delinquency, [the debtor] began making payments on a much more timely basis, establishing a history of more prompt payments continuing for the next year." *Global Tissue*, 106 Fed. Appx. 99 at 102-03. The Third Circuit concluded that payments made during the preference period were within the ordinary course, by comparing them with the more recent history of timely payments. *Id.*

similarly situated creditors are treated equally and that one creditor is not "preferred" over another creditor during the debtor's "slide into bankruptcy." *SPW Corp.*, 96 B.R. at 679. To allow Coastal to sift through years and years of data in order to find some evidence that everything about which the Agent now complains occurred at some point in the parties' nearly twenty-year relationship would essentially allow Coastal to use idiosyncratic events, which may have occurred years apart, to argue that there is "some consistency" between the Payments in the Preference Period and some other payment or payments it received over the parties' lengthy business relationship. That would be fundamentally unfair to other unsecured creditors, who may have had less history with Kevco at the time that Wingate decided to invest in Kevco and bring new senior management on board, at which point all of Kevco's creditors started anew and on equal footing. The purpose of the ordinary course of business exception is to "leave undisturbed normal financial relations." *Union Bank v. Wolas*, 502 U.S. 151, 160 (1991) (quoting H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 373 (1978), *reprinted in* 5 U.S.C.C.A.N. 6329 (1978)). In the Kevco Case, what was "normal" between Kevco and Coastal changed after Wingate's investment and new senior management was in place. Moreover, fifteen months is a sufficient period of time to serve as a yardstick against which to measure the Payments made to Coastal during the Preference Period.[19] When the Court compares payments made to Coastal during the Preference Period to those payments made to Coastal during the Wingate

---

[19] The Agent initially performed its "ordinary course" analysis using the data from the nine months immediately preceding the Preference Period, because that was the data provided to him by Kevco's books and records – *i.e.,* the Agent had only twelve months of data (the nine months prior to the Preference Period and the approximately three months of the Preference Period). Coastal subsequently provided the Agent with data going back another eight years. Coastal provided the data to the Agent, however, in hard copy form, which was not readily usable by his expert's computer analysis. However, the Agent's expert manually inputted approximately three years' worth of the data. After analyzing the additional three years' worth of data, the Agent's expert concluded that the longer period made no significant difference to his conclusions. As a result, the Agent concluded that inputting the additional five years' worth of data was not cost effective. Tr. 3/8/05, 148:17-149:9. The Court finds his testimony credible.

The Agent's expert, therefore, calculated some of the statistics used in his analysis considering only the nine months preceding the Preference Period, and not the entire fifteen months comprising the Wingate Historical Period. *See, e.g.*, Agent Ex. 82; Tr. 3/8/05, 181:25-182:11. In some instances, however, the Agent did compare the entire Wingate Historical Period to the Preference Period. *See, e.g.*, Agent Exs. 73, 74, 75 & 79. In other instances, the length of the historical period is irrelevant to the Court's analysis. *See, e.g.*, Agent Ex. 80 (establishing that during the Preference Period, Coastal was paid more quickly than Kevco's other vendors, indicating that Coastal was applying pressure to be paid and enforcing its credit limit).

Finally, the Court notes that Coastal took some of the same liberties with its exhibits for the same reason. Although the parties' relationship dates back to 1982, Coastal only looked at data since 1993, since that is what was readily available on its computerized records. Tr. 3/7/05, 100:7-17.

Historical Period, there is a clear difference in the payment pattern and manner of payments between those two time periods.

### b.      Changes in the Form and Manner of Payments

The Agent points to several changes in the parties' relationship during the Preference Period which he contends takes the Payments outside the ordinary course of business between the parties. First, the Agent points to changes in the amount and form of tender during the Preference Period which are inconsistent with the parties' pre-Preference Period practices.  For example, although Kevco's practice of paying by check did not change during the Preference Period, there was an increase in the number of checks sent by overnight mail during the Preference Period.  Kevco's normal business practice was to mail checks by first class mail.  Tr. 3/8/05, 109:17-22.  Yet, three of the twelve checks sent in the Preference Period appear to have been sent via overnight mail.  Tr. 3/8/05, 196:4-199:10; Joint Pretrial Order, ¶ 10 (listing dates of checks and dates of receipt of checks).  A fourth check was post-dated, and may have been overnighted as well, since it was dated November 25, 2000 but was deposited into Coastal's bank account on November 24, 2000.  Tr. 3/7/05, 204:4-19.  Simpson testified that Kevco would only overnight checks if there was some special reason – *i.e.*, usually in response to a demand from a vendor.  Tr. 3/8/05, 109:23-110:3. Kevco's efforts to pay Coastal more quickly than the U.S. Mail would permit, during a time when it is undisputed that Kevco did not have sufficient cash to pay all of its vendors, leads the Court to infer that these checks were overnighted either in response to a Coastal request or to bring Kevco within its newly enforced credit limit, so that Coastal would ship new product to Kevco.  Either explanation indicates increased collection activity by Coastal during the Preference Period.

Coastal argued that during the history of the parties' relationship, Kevco had previously overnighted checks to it.[20]  *See* Coastal Ex. 19, pp. 988, 990; Coastal Exs. 50D, 50E.  However, of

---

[20] To refute the Agent's claim that there was a change in the form and manner of payment during the Preference Period, Cook, Coastal's chief financial officer, undertook a review of Coastal's original documents and prepared a "Deposit Ticket Report" for items deposited between May 27, 1993 and February 4, 2001.  Coastal Ex. 3. He testified that he was only able to locate the backup documentation – *i.e.*, the deposit slips and checks – for 151 of the 251 checks issued between May 27, 1993 and November 6, 2000 (the day before the Preference Period).  Tr. 4/4/05, 96:2-12.  Therefore, his review did not locate all of the potential checks which may have been overnighted during that

the five or six checks that were sent by overnight mail between 1993 and the beginning of the Preference Period, only one of those overnight checks was during the Wingate Historical Period. Thus, there were three or four times the number of overnight checks during the Preference Period. Moreover, during the Preference Period, Kevco had to conserve cash. Agent Ex. 37 (Tr. 1/25/05, 31:25-32:7). It did not have sufficient funds to pay all of its creditors within terms, and it was prioritizing which creditors would get paid and which would not. Tr. 3/8/05, 87:9-18. Therefore, the Court infers that the increase in number of checks being overnighted resulted either from demands by Coastal or from Kevco's need to stay within its credit limit, which was being enforced against Kevco for the first time in the parties' relationship. Tr. 3/7/05, 50:1-10, 245:17-246:2, 247:15-248:6.

The Agent also points to an increase in the raw number of checks sent to Coastal during the Preference Period as opposed to the number sent to Coastal in like periods in the past. The parties agree that Kevco issued twelve checks to Coastal during the Preference Period. Those twelve checks were issued within a 70-day timespan. Coastal Ex. 24; Tr. 3/7/05, 199:11-20. This is inconsistent with the parties' past practice.[21] In the Wingate Historical Period, there was never a 70-day interval in which twelve checks were issued.[22] Coastal Exs. 3, 25, 27. In fact, there was never even a 90-day interval in which twelve checks were issued to Coastal during the Wingate Historical Period – the most that ever issued in 90 days was eight. *Id.*; Tr. 3/7/05, 208:3-6. Half again of that amount were issued during the Preference Period. Coastal Ex. 24.

The evidence also shows that during the nine months prior to the Preference Period, Kevco paid Coastal, on average, every thirteen days. Tr. 3/8/05, 187:14-21. During the Preference Period,

---

time frame. However, of the 151 checks he did locate, only five checks had been overnighted since 1993. Coastal Ex. 50D. This constitutes slightly less than 4% of the checks located in the seven and a half years preceding the Preference Period. In contrast, during the Preference Period, at least 25% (and perhaps 33%) of the checks were overnighted.

[21] Coastal points out that in many 90-day periods during the parties' business relationship, Kevco issued twelve or more checks. Coastal Ex. 18. However, none of those periods fell during the Wingate Historical Period. *Id.* Moreover, Cook conceded that he had strategically picked particular 90-day periods. Tr. 3/7/05, 108:18-20. He began each 90-day period on the date of a payment, which would maximize the number of checks in that 90-day period.

[22] Generally, between five and seven checks were issued within a 70-day time period during the Wingate Historical Period. Coastal Ex. 3.

Kevco paid Coastal much more frequently – on average, every six days. *Id*. Cobb conceded that during the Preference Period, Coastal wanted a commitment that a check would be "mailed immediately" before it would release shipments of new product, Tr. 3/7/05, 54:5-19 – again, evidencing pressure by Coastal to get paid more quickly.

Further, the Agent notes that Kevco traditionally performed "check runs," in which it paid its vendors, on the 10th and the 25th of each month. Tr. 3/8/05, 78:10-14. Simpson testified that Kevco would make payments to vendors on dates other than the 10th and the 25th in two other circumstances. First, if there was a dispute about an invoice which was subsequently resolved, and the amount was large, Kevco might cut a check to that vendor immediately and not wait for the next check run. Tr. 3/8/05, 80:17-82:3. Second, Simpson also testified that Kevco would issue checks on dates other than the 10th or 25th where Kevco had reached its credit limit with a vendor and the vendor would not release shipments of new product to Kevco until Kevco paid enough to bring it back within the credit limit. Tr. 3/8/05, 82:4-83:6. During the Preference Period, eight of the twelve checks sent to Coastal were issued on dates other than the 10th or 25th. Coastal Ex. 24. Steven Thomas ("Thomas"), the Agent's expert, testified that during the Wingate Historical Period there was an "almost eerie payment pattern . . . where they were paid like clockwork about every two weeks." Tr. 3/8/05, 140:13-25. During the Preference Period, that regularity is gone. Coastal Ex. 17; Agent Ex. 76; Tr. 3/8/05, 142:20-143:2.

The evidence also establishes that during the Preference Period, when Kevco was having cash flow difficulties, Kevco would still prepare checks on the 10th or 25th, but would only release those checks to vendors as money became available to cover the checks. Tr. 3/8/05, 86:8-23. However, after a regular check run, Kevco's checks to Coastal "went with the first batch . . . out of the payments system." Tr. 3/8/05, 86:18-87:6, 199:15-200:4. So, even when Coastal's check was issued on a day of a regular check run – *i.e.*, the 10th or 25th, Coastal was getting its checks while other vendors were not. Tr. 3/8/05, 86:8-87:18. Moreover, although the Debtor's last regular check run prior to the Petition Date was January 10th, Tr. 3/8/05, 108:19-109:16, Kevco issued two checks to

Coastal after that date. Coastal Ex. 24.

Coastal argues that going back to 1993, there were 37 checks issued to it by Kevco which were not dated on the 10th or 25th. Coastal Ex. 50C. However, only one of those checks was issued in the Wingate Historical Period, compared to eight such checks issued in the Preference Period.

Further, the evidence established that Kevco would occasionally issue manual checks – *i.e.*, checks not printed by machine during a normal check run. After reviewing the back-up documentation for 151 out of 251 of its Kevco-related bank deposits since 1993, Coastal located two such checks since 1993, one of which was during the Wingate Historical Period (when a total of 36 checks were issued).[23] Coastal Ex. 50E. There were four manual checks in the Preference Period. Tr. 3/8/05, 145:11-13; Agent Ex. 66. Finally, as noted above, there was also a post-dated check issued to Coastal during the Preference Period, and Coastal submitted no evidence that Kevco issued a post-dated check at any other time in the parties' relationship.

To summarize, when comparing the Preference Period to the Wingate Historical Period, the evidence establishes that during the Preference Period, Kevco (i) sent more checks to Coastal via overnight mail, (ii) issued substantially more checks to Coastal than it had during any prior 90-day period, (iii) paid Coastal more frequently, (iv) prepared more manual checks on dates other than the dates of its ordinary check runs – *i.e.*, the 10th and the 25th, (v) issued two checks to Coastal after its last normal check run prior to the Petition Date, and (vi) paid Coastal first when cash was short and it had to prioritize vendor payments. The Court concludes, therefore, that there was a change in the form and manner of payments during the Preference Period which deviated from the parties' ordinary course of business during the Wingate Historical Period.

### c. Termination of Credit Insurance and Kevco's Paydown of Debt

Coastal contends that the reduction in Kevco's credit limit occurred outside the Preference

---

[23] The "irregular" check during the Wingate Historical Period was irregular in several respects – it was a manual check, dated on a date other than the 10th or 25th, and which was overnighted. Coastal Ex. 50E. Thus, while the discussion above refers to several irregularities during the Wingate Historical Period, they mainly occurred on a single check.

Period, and thus may not be considered as an act by Coastal to extract payment from Kevco during the Preference Period. Coastal also contends that it reduced Kevco's credit limit solely in response to its loss of credit insurance on Kevco's accounts, which was an event that occured both outside the Preference Period and outside of Coastal's control.

The Court agrees with Coastal in part. It is undisputed that the credit insurance on Kevco's accounts was terminated outside the Preference Period and that Coastal notified Kevco of its new credit limit outside the Preference Period. And, while the reduction in Kevco's credit limit was outside the ordinary course of business between the parties, it occurred outside of the Preference Period. However, while Coastal did not reduce Kevco's credit limit during the Preference Period, it *enforced* a credit limit for the first time in the parties' history during the Preference Period. And, the *effect* of the reduction in Kevco's credit limit, and Coastal's first enforcement of that credit limit, occurred entirely during the Preference Period. In other words, Kevco's quick paydown of its outstanding account balance to bring it within the new, and newly enforced, credit limit occurred completely within the Preference Period.

Coastal's reaction to the termination of credit insurance on Kevco's accounts, while understandable, was not ordinary in the parties' relationship. For the first time in the history of the parties' relationship, Coastal began to enforce Kevco's credit limit. Agent Ex. 51; Tr. 3/7/05, 50:1-10, 245:17-246:2, 247:15-248:6. Coastal's argument would be more persuasive if it had always enforced Kevco's credit limit. Then, when the credit insurance on Kevco's accounts was terminated, causing Coastal to reduce Kevco's credit limit further, Coastal's continued enforcement of the new, lower limit would be consistent with its past practice of enforcing the credit limit. However, that is not what happened here. Coastal had never enforced Kevco's credit limit before, and it did so for the first time during the Preference Period. Agent Ex. 51; Tr. 3/7/05, 50:1-10, 245:17-246:2, 247:15-248:6.

Enforcement of the reduced credit limit meant either that Kevco had to come up with more cash more quickly in order to keep within its new credit limit or that it had to reduce its purchases

from Coastal. Agent Ex. 37 (Tr. 1/25/05, 34:2-19). Hegi testified that Coastal's payment terms were *effectively* changed by Coastal's enforcement of the new, lower credit limit during the Preference Period, Agent Ex. 37 (Tr. 1/25/05, 34:2-36:2), even though the printed terms on Coastal's invoices remained unchanged. This *de facto* change to Coastal's terms is evidenced by the speed with which Coastal's invoices were paid during the Preference Period. During the Preference Period, a higher percentage of invoices were paid not only within terms, but substantially early. Specifically, during the Preference Period, Kevco paid 9% of Coastal's invoices within ten days. Agent Ex. 82. During the preceding nine months, Kevco had paid only 1% of Coastal's invoices within ten days. *Id.* During the Preference Period, Kevco paid a total of 51%[24] of Coastal's invoices within twenty days, where it had paid only 27% within twenty days in the preceding nine months. *Id.* During the Preference Period, Kevco paid a total of 83% of Coastal's invoices within thirty day terms, when it had paid only 73% of Coastal's invoices within terms during the preceding nine months. *Id.* Cobb conceded that during the Preference Period, Coastal wanted a commitment that a check would be "mailed immediately" before it would release shipments of new product to Kevco. Tr. 3/7/05, 54:5-19. In addition, the amounts of the checks issued during the Preference Period were much smaller than the amounts of the checks issued in the nine months preceding the Preference Period. Tr. 3/8/05, 187:22-188:10. And, each check paid a much smaller number of invoices. Tr. 3/8/05, 188:3-10. Kevco was "paying more often and paying less invoices. So the amount of the payment would be smaller." Tr. 3/8/05, 188:21-23. Therefore, it is apparent that the *effective* terms between the parties changed during the Preference Period. And, this accelerated payment pattern occured during a time when Kevco was forced to manage its cash – *i.e.*, Kevco did not have sufficient cash to pay all its vendors within terms.

Coastal argues that the Agent's data is inaccurate. Coastal introduced evidence that of the 673 invoices paid during the Preference Period, 73 of them were not actually invoices for goods, but rather represented reimbursements to Coastal. Kevco, with its check dated October 25, 2000, had

---

[24] The 51% of invoices paid within twenty days necessarily includes the 9% paid within ten days.

paid Coastal on certain invoices but had taken discounts for early payment on 72 of the invoices (the 73rd was reimbursed in Kevco's December 10, 2000 check to Coastal). Tr. 4/4/05, 77:12-81:23. Coastal contended those discounts were improperly taken, and asked to be reimbursed. Kevco reimbursed Coastal in its check dated November 10, 2000. Tr. 4/4/05, 81:17-23. Coastal now argues that as a result, the Agent's data with respect to its calculation of the number of days between the invoice date and the payment date is incorrect. For example, the Agent shows that an invoice dated October 13 (which Coastal states was not an invoice date at all) was paid on November 10, when in fact the actual invoice for new goods was dated September 25. Tr. 4/4/05, 79:5-81:4. Therefore, while the Agent contends that the days to payment on this "invoice" was 28 days, Coastal contends that the days to payment was really 46 days. Thus, Coastal argues that the Agent's data is skewed to show that invoices were being paid more quickly than they actually were.

The Court agrees with Coastal in part. There were 73 instances during the Preference Period where Kevco reimbursed Coastal for such improperly taken discounts. Tr. 4/4/05, 81:17-23. And, those 73 instances were plotted as data points on many of the Agent's charts and graphs. While the Court agrees that the numbers may be *slightly* skewed by this error, the Court finds that the evidence still establishes that Kevco paid Coastal on an accelerated basis during the Preference Period. First, only 11% of the total invoices (which was 673) paid during the Preference Period are affected by this error. Second, 72 of the 73 errors occured on the November 10, 2000 check – the other error occured on the December 10, 2000 check. Therefore, even assuming an 11% error rate with respect to the very first check in the Preference Period, none of the other eleven checks during the Preference Period would be affected by the error,[25] which itself is relatively minor from a statistical point of view. In short, the Court finds Thomas's characterization of the data as showing an accelerated payment pattern to be both credible and supported by the evidence. Moreover, the number of days between the issuance of an invoice to Kevco and Kevco's payment of that invoice is simply irrelevant to many

---

[25] The error with respect to the December 10, 2000 check was related to one invoice out of the 21 paid with that check – *i.e.*, there was an error with respect to less than 5% of the invoices paid with that check.

aspects of the Agent's preference case, which relies instead upon a change in the form and manner of payments, a change in the pattern of payments, an accelerated pay down of the account balance owed to Coastal, an increase in Coastal's collection efforts at a time when Kevco was current on Coastal's invoices, and Kevco's apparent preferential treatment of Coastal *vis-à-vis* Kevco's other vendors.

As a result of the termination of the credit insurance on Kevco's accounts and the reduction and enforcement of the new, lower credit limit, Kevco paid down the debt it owed to Coastal dramatically during the Preference Period. At the end of October 2000, just prior to the commencement of the Preference Period, Kevco owed Coastal $931,000. Coastal Ex. 4; Agent Exs. 51, 74. At the end of November, Kevco owed Coastal $429,000. *Id*. By the end of December, Kevco owed Coastal $151,000. *Id*. On January 23, 2001, Kevco owed Coastal just $77,000 and, on the Petition Date, Kevco owed Coastal $214,000.[26] *Id*.; Agent Ex. 50. The largest-ever calendar quarter change in the amount owed to Coastal occurred during the Preference Period – *i.e.*, there was a $700,000 decrease in the amount owed to Coastal from the end of October 2000 to the end of January 2001.[27] In prior quarters during the Wingate Historical Period, the largest decrease in amounts owed to Coastal in any one calendar quarter was approximately $450,000. Agent Exs. 73, 75; Tr. 3/8/05, 154:9-157:16.[28]

---

[26] The Court infers from the evidence that Coastal permitted the account balance to increase because it had recently obtained new credit insurance on Kevco's accounts (up to $200,000) from CNA.

[27] Coastal points out that there were larger *monthly* changes in the accounts receivable balance in the years preceding the Preference Period than the monthly changes in accounts receivable balance during the Preference Period. Coastal Ex. 5. Coastal argues that using a quarterly measurement period is thus misleading. Coastal also argues that the Agent's depiction of this same information (Agent Ex. 73) is misleading because it implies a relationship between the data points when none in fact exists.

The Court disagrees. First, the Court notes that the 90-day Preference Period, which approximates one quarter, should be compared with other, preceding quarters to be consistent. What is important is the *pattern* during the roughly three-month period. For example, during the Preference Period, each of the three months involved a *decrease* in the accounts receivable balance. There was only one other time during the Wingate Historical Period where the balance decreased three months in a row, and the total decrease during that time was less than the total decrease during the Preference Period. Moreover, the Agent's chart, Agent Ex. 73, simply connects the data points chronologically to depict the change from one quarter to the next, while Coastal's Ex. 5 ties each month back to a zero account balance.

[28] In addition, the lowest total balance ever owed to Coastal at the end of any one calendar quarter, dating back to mid-1993, was during the Preference Period. Similarly, the lowest amount ever owed to Coastal in any one month, dating back to 1993, occurred during the Preference Period. Coastal Ex. 9; Agent Exs. 74, 75.

### d. Coastal's Collection Activity

Coastal argues that during the Preference Period, it did not engage in any unusual collection activity and that the Payments by Kevco during the Preference Period were not in response to Coastal taking any unusual measures in the Preference Period that differed from the history between Coastal and Kevco. At best, the evidence is equivocal. At worst, the evidence demonstrates increased collection activity by Coastal during the Preference Period.

Cobb testified that during the Preference Period, Coastal did not increase the frequency of its telephone calls to Kevco concerning the collection of its accounts receivable and that Coastal did not threaten legal action, ask for security, require payment in cash or in advance, or change the written terms of its invoices from the historical 1% ten, net 30. Tr. 3/7/05, 27:1-28:25. He conceded, however, that Coastal would not release shipments of new product to Kevco until Kevco committed to send payment on prior invoices, Tr. 3/7/05, 51:9-54:9, and that Kevco's payments to Coastal were not late during the Preference Period, so as to cause Coastal to withhold shipments.

Willits testified that he typically spoke with Cobb once or twice a month during the parties' relationship, Tr. 3/7/05, 244:14-25, and that he was unaware of any actions by Coastal during the Preference Period which varied from its efforts to collect accounts receivable in the pre-preference period. Tr. 3/7/05, 231:5-9. Willits further stated that he did not perceive Coastal to be trying to "squeeze" Kevco during the Preference Period. Tr. 3/7/05, 232:8-12. When pressed on cross-examination, however, Willits conceded that the calls from Cobb increased after Kevco's credit limit was reduced and that Coastal had never enforced a credit limit against Kevco until the fall of 2000.[29] Tr. 3/7/05, 245:17-246:2, 247:15-248:6, 251:20-252:5.

The Agent introduced other evidence that Coastal's collection activity increased during the Preference Period. Simpson testified that the phone calls from Coastal increased during the

---

[29] Willits was called as a witness by Coastal. Willits is presently employed by BBC, Tr. 3/7/05, 219:23-25, a company formed by several former Kevco employees shortly after the Debtors' filings. BBC currently distributes Coastal's product to the MHI. Tr. 3/7/05, 220:1-3, 20-23. Accordingly, BBC has a financial interest in the outcome of this adversary proceeding, as Coastal's financial condition will no doubt be greatly affected should the Agent recover a large judgment against it.

**Memorandum Opinion** **Page 31**

Preference Period generally, Tr. 3/8/05, 84:7-85:22, and that he personally received a call from Cobb asking about invoice payments during the Preference Period, Tr. 3/8/05, 84:20-21, which was unusual because his duties at Kevco did not require him to deal directly with vendors. Tr. 3/8/05, 92:25-93:8.[30] And, as noted earlier, the changes in the form and manner of payments from Kevco to Coastal, and Coastal's refusal to ship new goods without payment on outstanding invoices, also indicate increased collection activity by Coastal. *See supra* pp. 23 to 26.[31]

Finally, there is no question that Kevco was paying Coastal more quickly during the Preference Period than it was paying its other vendors. Agent Ex. 80.[32] Coastal was in a position to exert pressure on Kevco. It was one of Kevco's top ten vendors and Kevco's sole source of supply for shower doors. Tr. 3/7/05, 34:7-12; Agent Ex. 37 (Tr. 1/25/05, 27:8-13). Although Kevco could have found another vendor to supply it before the MHI started to fail, it would have had difficulty replacing Coastal as the MHI, and Kevco's creditworthiness, declined. Agent Ex. 37 (Tr. 1/25/05, 27:22-28:6, 28:13-17).

For these reasons, Coastal has not established, by a preponderance of the evidence, the absence of unusual collection activity. Rather, the Court finds that Coastal increased its collection activity during the Preference Period and that its collection activity was unusual, in that it was occurring at a time when Kevco was paying Coastal's invoices on time. Tr. 3/7/05, 72:15-73:16.

One final Coastal argument should be addressed. Coastal contends that the dramatic pay down of Kevco's account balance was the result of Kevco simply ordering less product. Cobb

---

[30] Cobb did not recall making that call. Tr. 3/7/05, 42:20-22.

[31] Cobb conceded that had Kevco simply paid its outstanding invoices on time (which it was doing), but had ordered less product (which it was doing), then the accounts receivable balance would have dropped on its own within 30 to 60 days, without any collection activity by Coastal. Tr. 3/7/05, 67:23-72:20.

[32] Coastal argues that what Kevco did *vis-à-vis* its other vendors is irrelevant to the analysis under section 547(c)(2)(B), where the Court considers the relationship between Kevco and Coastal. However, the Court believes that the difference between the way Kevco paid Coastal and the way it paid its other vendors is relevant as evidence of collection efforts by Coastal. Coastal also argues that the data underlying Agent Ex. 80 is flawed, because it incorporates the 73 incorrect data points identified earlier. However, all but one of those data points relate to the November 10, 2000 check. Therefore, they would not change the graphed data points for December and January, where the differing treatment of Kevco's vendors is most apparent.

testified that general industry downturns greatly affect Coastal, because its product is expendable in the industry. Tr. 3/7/05, 29:23-30:13. Simpson testified that Kevco's sales were declining and that, as a general rule, Kevco would order less from vendors under those circumstances. Tr. 3/8/05, 101:10-18. Willits also testified that Kevco's orders from its vendors, including Coastal, began to decline. Tr. 3/7/05, 228:9-25. Finally, Cook identified several factors, such as a bad winter in Indiana, which he believed caused a reduction in Kevco's orders and, in turn, a reduction in Kevco's accounts receivable balance. Tr. 3/7/05, 128:20-129:16.

However, after considering all of Coastal's arguments and the evidence as a whole, the Court finds that Kevco's pay down of its Coastal debt resulted in large part from Coastal's collection efforts. This is so for several reasons. First, Cobb conceded that Coastal wanted Kevco's payments during what turned out to be the Preference Period to be in excess of the value of new product being shipped to Kevco by Coastal. Tr. 3/7/05, 55:2-16. Second, Cobb conceded that Coastal withheld shipments of new product to Kevco during the Preference Period, even though Kevco was paying Coastal's outstanding invoices within terms. Tr. 3/7/05, 51:20-24, 54:5-9, 72:10-20. Finally, the evidence shows that the MHI was in a steady decline by late 1999, which continued after the Petition Date. Tr. 3/7/05, 227:23-228:3, 229:5-7. Therefore, if Coastal's argument was valid, Kevco's account balance with Coastal should have begun to to drop steadily by early 2000, but it did not. Instead, Kevco's account balance experienced a dramatic drop from October 2000 through January 2001 (during the Preference Period), when during those same months the year before (from October 1999 through January 2000) it had increased. Agent Ex. 81.

While it is possible that the pay down in Kevco's account balance was affected to some extent by the downturn in the MHI and Kevco's reduced product orders, it is more likely that Coastal's concern about Kevco's financial condition and Coastal's desire to significantly reduce its credit exposure precipitated Coastal's efforts to keep Kevco within its new, lower credit limit and to require the pay down of its accounts receivable. At the very least, Coastal has failed to carry its burden of proof on its affirmative defense because there is insufficient evidence that the pay down of Kevco's

account balance was caused by something other than Coastal's unusual collection efforts. Accordingly, the Court finds that the dramatic drop in Kevco's account balance during the Preference Period resulted from more than just declining product orders during an industry downturn.

Coastal also points out that there were other times during the parties' relationship that the monthly accounts receivable balance dropped as much as it did in any one month during the Preference Period. Coastal Exs. 4, 5, 9; Tr. 3/7/05, 112:7-25. However, it is not the drop in the absolute number that is significant. It is the drop, combined with the unusual collection efforts and the change in the form and manner of Kevco's payments, which takes the Payments outside the protection of section 547(c)(2).

In sum, the Court finds that there were unusual collection efforts by Coastal and a change in the form and manner of Kevco's payments during the Preference Period. This finding is also supported by the credible testimony of the Agent's expert, who testified that the Payments were not made in the ordinary course of business between Kevco and Coastal. Coastal attempts to discount his opinion by arguing that the data upon which he relied is flawed. The flaw which Coastal points to is that many of his graphs and charts use the invoice date and the check date as the relevant dates for ordinary course purposes, when they should have used the invoice date and the date Coastal received the check instead. However, the evidence showed that using the date of the check instead of the date Coastal received the check would only be significant if there was evidence that Kevco was holding checks. Tr. 3/7/05, 98:5-10. Of the 14 checks Coastal identified as being held (out of a total of 263 checks issued to it since 1993), only one of them was during the Wingate Historical Period, and none of them were during the Preference Period. Coastal Ex. 50B. In fact, it is clear that checks were not only released to Coastal right away during the Preference Period, but more of them were sent by overnight mail than had been sent by overnight mail during the Wingate Historical Period. Finally, the Court agrees with the Agent that the *pattern* of payments remains the same if you prepare the charts based on the check date or the date of Coastal's receipt of the payment.

###### e.    Other factors

There are, however, other factors which might, at first blush, appear to favor a successful ordinary course defense. For example, the total absolute dollar amount paid by Kevco during the Preference Period (a total of $1,926,172.90) is not significantly different from the amount it paid to Coastal in like intervals over the course of the parties' relationship.[33] Coastal Ex. 3. In addition, Coastal does not appear to have known about Kevco's impending bankruptcy filing, Tr. 3/7/05, 26:13-16, and Cobb testified that Coastal remained hopeful about Kevco's ability to successfully weather the adverse conditions in the MHI, Tr. 3/7/05, 24:10-15, and took comfort in the fact that it was able to obtain replacement credit insurance on Kevco's accounts from CNA. Tr. 3/7/05, 22:1-7. Coastal also points out that only three days before Kevco's bankruptcy filing, Coastal sent a letter to customers recommending that they continue doing business with Kevco and expressing confidence that Kevco would get through the difficult times in the MHI. Coastal Ex. 16; Tr. 3/7/05, 31:20-32:8.

However, Coastal concedes that it knew of the bankruptcy filing by one of Kevco's large customers, Tr. 3/7/05, 40:1-19, and clearly knew that the industry was in a "rapid collapse." Tr. 3/7/05, 22:12-16. While Coastal asserts that its letter to customers is evidence of Coastal's belief that Kevco's financial condition would improve, an equally reasonable inference from the record as a whole is that Coastal recognized how bad Kevco's financial condition was, and was taking measures to try to prevent the financial collapse of its largest customer.

After carefully considering the voluminous record as a whole, the Court finds that the preponderance of the evidence lies with the Agent, although by a relatively small margin. At most, the evidence is equivocal, with some factors weighing in favor of the Agent and some factors weighing in favor of Coastal. When that is the case, the party with the burden of proof has failed to carry that burden. Here, that party is Coastal. In short, Coastal has failed to prove by a preponderance of the evidence that the Payments were made to it in the ordinary course of business.

## 2. Ordinary in the Industry – the Objective Test

---

[33] What this overlooks, of course, is the lesser amounts of product being purchased by Kevco during the Preference Period. Tr. 3/7/05, 29:14-20.

Because the Bankruptcy Code does not define the phrase "ordinary business terms" in section 547(c)(2)(C), courts have been left to fashion a definition or a test as to whether payments were made according to "ordinary business terms." In *Gulf City Seafoods, Inc.*, the Fifth Circuit noted the general consensus among the circuit courts that:

> a payment is "according to ordinary business terms" if the payment practices at issue comport with the standard in the industry . . . . [T]he relevant inquiry is 'objective'. . . we compare the credit arrangements between other similarly situated debtors and creditors in the industry to see whether the payment practices at issue are consistent with what takes place in the industry. By consistent, we do not necessarily mean identical.

296 F.3d 363, 367-68 (5th Cir. 2002).

Expressing general agreement with the Seventh Circuit's views in *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1033 (7th Cir. 1993) (only dealings so *idiosyncratic* as to fall outside that broad range should be deemed extraordinary and, therefore, outside the scope of ordinary business terms), the *Gulf City Seafoods, Inc.* court stated that "the ultimate question is simply whether a particular arrangement is so out of line with what others do that it fails to be 'according to ordinary business terms.'" 296 F.3d at 369. Similarly, the Sixth Circuit has held that a transfer is outside the ordinary course of business if the transfer is so unusual as to render it an *aberration* in the relevant industry. *See Luper v. Columbia Gas of Ohio, Inc. (In re Carled, Inc.)*, 91 F.3d 811, 818 (6th Cir. 1996). The Third and Fourth Circuits have defined the standard such that the transfer must be a *gross departure* from the industry norm. *See Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.)*, 18 F.3d 217, 226 (3d Cir. 1994); *Advo-Sys., Inc. v. Maxway Corp.*, 37 F.3d 1044, 1050 (4th Cir. 1994). The Eighth Circuit has looked to see if the transfers were *particularly unusual* in the relevant industry. *See Jones v. United Sav. & Loan Ass'n (In re U.S.A. Inns of Eureka Springs, Ark., Inc.)*, 9 F.3d 680, 685 (8th Cir. 1993). According to the *Gulf City Seafoods, Inc.* court, "[d]efining the industry whose standard should be used for comparison is not always a simple task . . . . In our view, for an industry standard to be useful as a rough benchmark, the creditor should provide evidence of credit arrangements of other debtors and creditors in a similar market, preferably both geographic and product." *Gulf City Seafoods, Inc.*, 296 F.3d at 369.

Here, Coastal has provided the Court with insufficient evidence that the Payments were made according to ordinary business terms within the relevant industry. Coastal's primary witness[34] was James Cunningham ("Cunningham"), the regional credit manager at O'Neal Steel, Inc. ("O'Neal") for the past 27 years. Tr. 3/7/05, 264:18-25. The Court cannot give much weight to Cunningham's testimony as that testimony did not establish what constitutes ordinary business terms in the relevant industry. As the *Gulf City Seafoods, Inc.* court noted, "for an industry standard to be useful as a rough benchmark," Coastal needed to "provide evidence of credit arrangements of other debtors and creditors in a similar market." 296 F.3d at 369. Cunningham could not identify any of Kevco's competitors. Tr. 3/7/05, 302:19-303:2. Nor could he identify any of Coastal's competitors. Tr. 3/7/05, 303:3-4. Combined, those entities define the universe of the appropriate industry. Cunningham testified that he could not locate much information about Kevco and its place in the MHI. Tr. 3/7/05, 280:1-8. The MHI is a discrete industry with its own national trade organization that compiles and publishes its own data. Tr. 3/7/05, 80:4-23. Coastal also apparently recognizes that the MHI is a discrete industry, because it employs a "vice president of mobile home and RV sales," whose job it is to sell to and report upon the MHI. Tr. 3/7/05, 118:24-120:10. Because he could not identify any of Kevco's or Coastal's competitors, Cunningham was unable to offer any evidence of their credit arrangements. Tr. 3/7/05, 303:5-7. *See Gulf City Seafoods*, *Inc.*, 296 F.3d at 369.

Instead, Cunningham testified to the general manufacturing industry, which is far too broad. His entire testimony came solely from his experience at O'Neal, which is a steel service center providing raw and fabricated parts to the construction and manufacturing industries. Tr. 3/7/05, 265:17-25. O'Neal had less than a handful of customers which could be considered participants in the MHI, Tr. 3/7/05, 293:7-14, 308:20-309:14, and Cunningham had no specific knowledge with

---

[34] Coastal presented some limited evidence from Cobb, Willits, and Ray Adams, Coastal's current president, ("Adams") as to payment terms common in the MHI. Tr. 3/7/05, 146:12-147:22, 233:22-234:4. They testified that the industry commonly uses 1% ten, net 30 terms, and that it is common for vendors to call customers with late payments, and that customers pay at a variety of times: some pay before 30 days, some pay right at 30 days, and some pay after 30 days – and other customers' payments vary. These industry practices are not at issue in this adversary proceeding, and the testimony by Cobb, Willits, and Adams sheds little light on the practices that *are* at issue.

respect to the MHI. To prepare for his expert testimony, he did not contact anyone else outside of the steel industry (or anyone in the steel industry, for that matter) to discuss collection practices. Tr. 3/7/05, 309:24-310:15. Instead, he testified to collection practices at O'Neal and general practices in the manufacturing industry.

To prepare for his expert testimony, Cunningham reviewed the payment terms and collection history between Coastal and Kevco, looked at O'Neal's credit history reports and range of payment terms, reviewed O'Neal's "Day Sales Outstanding" report, which records the time from shipment of product to the date payments are received, and compared it to similar reports in the manufacturing industry. Tr. 3/7/05, 285:5-286:18. He also relied on general knowledge obtained as a member of both the National Association of Credit Managers and the Southwest Metals Group. Tr. 3/7/05, 267:14-269:20. But, he did not do any research with respect to collection practices in the MHI. Tr. 3/7/05, 311:16-312:3.

Cunningham testified that 1% ten, net 30 terms are common in the manufacturing industry. Tr. 3/7/05, 287:17-23. He testified that it is common for some payments to be made before 30 days and some after. Tr. 3/7/05, 291:5-14. He testified that he would allow long-term customers to go above their credit limits, but would try to keep new customers within the limit. Tr. 3/7/05, 288:12-289:10, 290:10-291:4, 292:19-293:4. He testified that lots of companies schedule particular check runs and that sometimes checks are held. Tr. 3/7/05, 295:16-25. He said it is common in the manufacturing industry to raise and lower credit limits or to ask for security. Tr. 3/7/05, 297:5-298:12. When a form of security is lost, he testified that it is common to lower the credit limit or ask for another form of security. Tr. 3/7/05, 298:13-21. In his opinion, Coastal's decision to lower the credit limit when its credit insurance was lost is consistent with ordinary practice in the general manufacturing industry. Tr. 3/7/05, 298:22-25, 301:10-24. He stated that he would not make collection calls, in general, until invoices were 45 days past due. Tr. 3/7/05, 297:1-4.

Despite his general knowledge of collection practices in the general manufacturing industry, and his testimony with respect to what O'Neal does, Cunningham provided no insight with respect

to many of the practices at issue in this case. He did not speak to any former employees of Kevco. Tr. 3/7/05, 303:16-17. He did not know if Coastal made collection calls during the Preference Period. Tr. 3/7/05, 307:11-13. He did not know on what days Kevco normally ran checks or whether those checks were ever held. Tr. 3/7/05, 303:8-15. He did not know whether Coastal enforced its credit limits – either historically or during the Preference Period. Tr. 3/7/05, 304:10-13. He did not know what the levels of accounts receivable between Kevco and Coastal were during any time period. Tr. 3/7/05, 304:14-20. He did not know whether Coastal held shipments during the Preference Period to induce payments by Kevco. Tr. 3/7/05, 307:14-22. He did not know whether Kevco paid Coastal's invoices in response to telephone calls from Coastal on invoices that were not yet past due. Tr. 3/7/05, 308:16-19.

Cunningham basically testified that collection efforts are appropriate when there is a concern regarding late payment or a change in circumstances. He never stated that such efforts were appropriate when the debtor is paying invoices on time. He never testified as to what Coastal did or did not do or whether its actions were appropriate or in accord with standards in the MHI. He testified only about what O'Neal, and perhaps its competitors, would do.

In sum, Coastal defined the industry too broadly. Further, it provided no evidence with respect to many of the practices at issue in this case. Its expert did not review Coastal's collection activity in this case and compare it to any industry norm and did not examine the relevant Kevco payment practices either in the Wingate Historical Period or in the Preference Period. The Court therefore concludes that Coastal has failed to carry its burden under section 547(c)(2)(C).

### C. The New Value Defense

Coastal's third (and partial) defense to the Agent's claim is based on section 547(c)(4) of the Bankruptcy Code, commonly referred to as the subsequent new value defense. To prevail on its subsequent new value defense, Coastal must establish, by a preponderance of the evidence, that the Payments were made:

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor –

**Memorandum Opinion** **Page 39**

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor . . . .

11 U.S.C. § 547(c)(4).

The leading case on the section 547(c)(4) defense in the Fifth Circuit is *In re Micro Innovations Corp.*, 185 F.3d 329 (5th Cir. 1999), in which the court followed its earlier decision in *In re Toyota of Jefferson, Inc.*, 14 F.3d 1088 (5th Cir. 1994). Observing that revolving credit arrangements such as that present in *Toyota of Jefferson* were the kinds of arrangements the Bankruptcy Code seeks to protect, the Fifth Circuit stated two policy justifications for section 547(c)(4). First, it limits the risk of loss incurred by suppliers who continue ordinary credit arrangements with troubled companies, and thus encourages transactions that may allow the debtor to stave off bankruptcy. Second, it does not materially harm the other creditors, since the requirement that a preference payment be followed by an extension of new value insures that any "injury" to the estate is followed by a subsequent addition to the estate. In other words, the creditor-defendant "replenishes" the estate by extending new value. *Micro Innovations*, 185 F.3d at 336.

The *Micro Innovations* court stated that it was not resurrecting the old "net result rule." Rather, in *Toyota of Jefferson*, the court looked at each individual payment to see if it was followed by the extension of a new loan. Thus, any advances made after the beginning of the Preference Period, but before receipt of the first preference payment, would not be eligible for protection under section 547(c)(4) as they had been under the pre-Code "net result rule." The court summed up by saying:

> All that we have done here is read the plain language of the statute in light of its manifest purpose, shielding payments to the extent that thereafter [defendant] extended new value to the estate.

*Micro Innovations*, 185 F.3d at 334.

In this case, Coastal and the Agent agree that Coastal shipped products to Kevco on various dates after the date of the first transfer on November 10, 2000. *See* Joint Pretrial Order, ¶ 24. In fact, the parties agree that after the first preferential payment, Coastal shipped $1,112,545.19 in new

products to Kevco. *Id.* Because this Court has determined that Coastal is not entitled to any other defenses, Coastal is entitled to a subsequent new value defense in the amount of $1,112,545.19.

## III. CONCLUSION

The Agent's claim against Coastal is not barred by the doctrine of judicial estoppel. Coastal received preferential transfers in the amount of $1,926,172.90. Coastal has failed to carry its burden of proof under 11 U.S.C. § 547(c)(2) and (g), and thus, none of the transfers are shielded by the ordinary course of business defense. Coastal is, however, entitled to a subsequent new value defense in the amount of $1,112,545.19. Accordingly, the Agent is entitled to a judgment against Coastal in the amount of $813,627.71, plus pre-judgment interest on that amount from the date of the Agent's demand on Coastal to repay the preference it received (on or about January 28, 2003). *Southmark Corp v. Schulte, Roth & Zabel, LLP*, 242 B.R. 330, 343 (N.D. Tex. 1999), *aff'd in relevant part*, 239 F.3d 365 (5th Cir. 2000) (unpublished disposition) (stating that pre-judgment interest begins to accrue from the date of demand for the return of the property preferentially transferred). The Agent is also entitled to post-judgment interest from the date of the judgment until the judgment is paid. 28 U.S.C. § 1961 (providing for interest on money judgments in a civil case).

A judgment consistent with this Memorandum Opinion will be entered separately.

### End of Memorandum Opinion ###